NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

_____
|
**MARCO MINUTO**                          :
                                          :      **Civil Action No. 11-3391 (ES)**
                        **Plaintiff,**    :
        **v.**                            :
                                          :
**GENESIS ADVISORY SERVICES, INC.**       :              **OPINION**
**and BRUCE FIXELLE**                     :
                                          :
                        **Defendants.**   :
_____  :

**SALAS, District Judge**

Now pending before this Court is Defendant Bruce Fixelle ("Fixelle") and Defendant Genesis Advisory Services, Inc.'s ("Genesis") (collectively, "Defendants") joint motion to dismiss Plaintiff Marco Minuto's ("Plaintiff") Complaint (D.E. 1) pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted. (D.E. 4). The Court has considered the briefs submitted in support of and in opposition to the present motion, and decides the matter without oral argument pursuant to Fed. R. Civ. P. 78(b). For the reasons set forth below, Defendants' motion to dismiss is GRANTED in part and DENIED in part.

### I.      Jurisdiction

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the parties are completely diverse, and the amount in controversy exceeds $75,000.00, exclusive of interests and costs.

### II.     Background

Plaintiff is a resident of New Jersey. (Compl. ¶ 1). Defendant Genesis is a Florida corporation with its principal place of business in Naples, Florida. (*Id.*). Defendant Bruce

Fixelle is a resident of Florida.  He is the sole managing member of Genesis.  (*Id.*).

Minuto was hired by Genesis to start and manage a hedge fund with the assets of Genesis.  (*Id.* ¶ 6).  Minuto was to establish a limited liability company (LLC) of which he would be the sole managing member.  (*Id.*).  On behalf of the LLC, Minuto was to establish broker relationships at large "bracket" banks on Wall Street.  (*Id.*).  Through those relationships, Minuto was to exclusively trade shares of initial public offerings ("IPO").  (*Id.*).  In short, the Genesis business model was to generate large commissions for the brokers by trading large volumes of shares in exchange for access to IPO allocations.  (*Id.* ¶ 12).  The more shares that are traded with a broker, the larger the broker's commission.  (*Id.*).  In turn, as the broker-trader relationship strengthens, the size of IPO allocations from the broker increases.  (*Id.*).  Genesis would purchase shares from a broker at one price and immediately sell them to another broker at the same price.  (*Id.*).  A commission of six cents per share, however, is paid to each the buying and selling broker.  (*Id.*).  Hence, a new trader attempting to build multiple relationships can quickly lose money waiting for the next IPO.  (*Id.*).  Once the broker/trader relationship reaches the point where sizable allocations are received on each IPO that is underwritten, however, the relationship becomes profitable.  (*Id.*).  An initial $7,000 draw was given to Minuto to cover the initial stage of the relationship-building process.  (*Id.* ¶ 13).

Minuto's employment with Genesis began on February 3, 2011.  (*Id.* ¶ 6).  As compensation for his employment, Minuto received a "draw," or an advance on his future earnings, of $7,000 per month.  (*Id.* ¶ 10).  Fixelle had estimated that depending on Minuto's progress, it would take between three and six months before Minuto would earn money equal to or in excess of this draw.  (*Id.*).  Once Minuto reached the $7,000 threshold, he was to be paid, on a monthly basis, the higher of the draw or forty percent of the net profit and loss ("P&L") of

his transactions for the month.  (*Id.*).  Fixelle represented to Minuto that the other sixty percent of the P&L was kept by Genesis to pay for rent, salaries to office administrators, licensing fees, trading platform fees, back office fees, and other expenses.  (*Id.* ¶ 11).  Fixelle further explained, it was also kept as capital to purchase and sell stock, and was warranted because Genesis took sixty percent of the risk in connection with trading transactions.  (*Id.*).  Minuto was responsible for forty percent of the losses.  (*Id.*).

One of the largest investors in Genesis is the Wolfson Family, which entrusts Genesis to manage a large amount of family assets.  (*Id.* ¶ 7).  In connection with his employment, and at the direction and approval of Fixelle, Minuto created Wolfson Capital Management, LLC.  (*Id.* ¶ 8).  That company served as the vehicle through which Minuto executed his trades.  (*Id.*).

Within several weeks of starting at Genesis, Minuto established broker relationships at Goldman Sachs, JP Morgan, Deutsche Bank, Credit Suisse and Bank of America Merrill Lynch. (*Id.* ¶ 12).  Minuto was able to open broker accounts at these banks and obtain IPO shares, called "allocations", because of his personal contacts within the banks.  (*Id.*).  Minuto claims that his personal contacts were one of the principal reasons he was hired by Genesis.  (*Id.* ¶ 9).  Minuto was able to open a trading account at Goldman Sachs, "a notoriously difficult bank with which to establish a trading relationship."  (*Id.*).  Minuto was the only Genesis employee who had coverage at Goldman Sachs.  (*Id.*).  Minuto later learned that Fixelle had been blacklisted by Goldman Sachs many years earlier.  (*Id.*).  Fixelle told Minuto in a text message: "My name is no good there."  (*Id.*).

On March 10, 2011, the Hospital Corporation of America ("HCA") issued an IPO which, according to Minuto, was to be "the largest private equity backed IPO in history."  (*Id.* ¶ 15). Michael Coticchio ("Coticchio"), a "de facto" manager of Genesis, told Minuto that Senator

Frist's family owned HCA, and suggested jokingly that Minuto should ask the family for IPO stock.  (*Id.*).  It appears that Coticchio was unaware that Minuto actually knew the Frist family.  (*Id.*).

Minuto contacted Senator Frist's speech writer.  (*Id.*).  As a result of that contact, Minuto was able to secure 200,000 shares of HCA IPO stock through Bank of America Merrill Lynch.  Fixelle and Minuto's coworkers were elated.  (*Id.* ¶¶ 16, 17).  According to Minuto, Genesis was not accustomed to receiving such a large block of IPO shares.  (*Id.* ¶ 18).

On March 1, Fixelle asked Minuto to attempt to acquire an additional 100,000 HCA IPO shares, for a total of 300,000. Minuto succeeded.  (*Id.* ¶ 19).  The next day, Fixelle informed Minuto that he would be taking the additional 100,000 shares for his son, Coticchio, and himself.  Minuto responded by e-mailing Fixelle's son to tell him that he did not agree to be excluded from the additional 100,000 shares.  (*Id.*).

The next day, Fixelle told Minuto that if he wanted to remain employed at Genesis he would have to learn to "give a little back."  (*Id.* ¶ 21).  Minuto responded that he was unaware of any other instances in the office where an employee gave shares he acquired to another coworker and alleges that, in his experience, coworkers typically did not give each other a portion of their earnings.  (*Id.*).  Fixelle "threw Minuto out of his office, but then almost immediately apologized and agreed that Minuto should keep the 100,000 shares."  (*Id.*).  Fixelle then asked whether Minuto could increase the IPO allocation to 500,000 shares.  (*Id.*).  The next day Minuto was successful, bringing his total allocation to 700,000 IPO shares.  (*Id.*).

The morning on which HCA was to trade, Minuto acquired additional shares, putting the total allocation at 1 million shares.  (*Id.* ¶ 22).  The shares were purchased at $30 per share, and sold at $31.20 per share.  (*Id.*).  Minuto's gross profit on the IPO offering was $1,120,000. This

was in addition to the profit on other trades that he executed in March 2011.  (*Id.*).

The day after the HCA IPO closed, Fixelle and Minuto travelled to Chicago for business meetings.  (*Id.* ¶ 24).  During that trip, Fixelle attempted to convince Minuto that the Wolfson Family was partly responsible for Minuto being allocated a large block of HCA IPO shares.  (*Id.*).  Minuto assured Fixelle that the shares were received solely because of Minuto's relationship with Senator Frist's office.  (*Id.*).  "Fixelle was compelled to agree, because he had been privy to several conversations between Minuto and Senator Frist's speech writer, in which she agreed to 'open the right doors' for Minuto."  (*Id.*).

Several days after the HCA IPO traded, Coticchio asked Minuto for $100,000 for having mentioned the HCA IPO to Minuto.  (*Id.* ¶ 26).  Coticchio then suggested Minuto give Coticchio $50,000 and the other $50,000 would come from Fixelle.  (*Id.*).  Minuto did not agree to make the payment to Coticchio.  (*Id.*).

"In April, Fixelle called Minuto into his office for a meeting."  (*Id.* ¶ 25).  Fixelle once again told Minuto that if he expected to remain at Genesis he would have to "give back."  (*Id.*).  Fixelle again asked Minuto if he thought that the Wolfson Family was responsible for his HCA IPO allocation.  (*Id.*).  Minuto answered "no."  (*Id.*).  Fixelle then suggested that the Wolfson Family was ten percent responsible for the allocation.  (*Id.*).  Minuto disagreed.  (*Id.*).  Nevertheless, Fixelle dictated that Minuto would have to give the family ten percent of the total net profit from the HCA deal.  (*Id.*).  When Minuto protested, Fixelle told Minuto that he needed to at least give $75,000.  (*Id.*).

On or about April 5, 2011—after all trades for the month of March had been executed, booked and settled—Minuto requested his March P&L statement.  (*Id.* ¶ 27).  Minuto alleges that, according to his P&L statement, his P&L for the month of March was $448,899.77.  (*Id.*).

Minuto alleges that Fixelle and Genesis improperly deducted $75,000 to be paid to the Wolfson Family.  (*Id.*).

At Genesis, paychecks are distributed to employees on the fifteenth of each month for the past month's P&L.  (*Id.* ¶ 28).  On April l4th, Fixelle suggested to Minuto that he leave his money in the company.  (*Id.*).  Minuto had never heard of this being done at Genesis, and did not understand how leaving the money in Genesis could benefit him.  (*Id.*).  Minuto refused to keep his money in the company.  (*Id.* ¶ 29).

On April 14, 2011, Minuto called his broker at Goldman Sachs, Sara Naison-Russell, to inquire about opening a cash account with approximately $250,000.  (*Id.* ¶ 30).  The broker allegedly told Minuto that she would love to do more business with him.  (*Id.*).  When Minuto told Fixelle about the good news, he alleges that Fixelle said that he would not allow Minuto to open the cash account.  (*Id.* ¶ 31).

April 15, 2011 was payday at Genesis.  (*Id.* ¶ 33).  By 3:00 p.m. Minuto had not received his check.  (*Id.*).  Later that afternoon, Fixelle called Minuto into his office, and he handed Minuto an "adjusted" P&L statement showing a payment amount of $432,017.1l.  (*Id.*).  As previously stated, Minuto alleges that his March P&L was $448,899.77.  (*Id.* ¶ 27).  Minuto alleges that the P&L was "fraudulently doctored to reduce the true compensation to which Minuto was entitled."  (*Id.*).  During that same meeting, Fixelle further stated that he did not have the money to pay the full check, but that he would give Minuto $150,000 and the rest would be paid the following Monday or Tuesday.  (*Id.*).

The following Tuesday, Fixelle provided Minuto with another check—but only for $100,000 (*id.* ¶ 34); as opposed to $150,000.  As of that day, Minuto had only received $250,000 of the total compensation allegedly due him.  (*Id.*).  Minuto assumed that Fixelle did not have the

remaining money but that it would be paid him the next day.  (*Id.*).

On that same day or some time soon after, Minuto recalled Coticchio's earlier request for $50,000.  Minuto wondered whether Fixelle had given Coticchio the $50,000 even though Minuto had never agreed to it.  (*Id.* ¶ 35).  Minuto sent a text message to Fixelle, asking to discuss Coticchio so that "they could get Coticchio 'squared away.'"  (*Id.*).  Thereafter, allegedly under pressure from Fixelle and Coticchio, Minuto decided to pay Coticchio $25,000 "for nothing."  (*Id.*).  When he later told Coticchio that he would pay him $25,000 rather than the $50,000 Coticchio requested, Coticchio informed Minuto that Fixelle had already earmarked Minuto's $50,000 to pay for Coticchio's $50,000 investment in an upcoming IPO.  (*Id.*).

When Minuto confronted Fixelle about the supposed $50,000 agreement, Minuto alleges that Fixelle "falsely stated" that Minuto had agreed that Minuto would "match whatever Fixelle gave Coticchio."  (*Id.* ¶ 37).  Minuto alleges that he never agreed to such an arrangement.  (*Id.*).  Fixelle then stated that he was going to make an "executive decision."  (*Id.*).  Fixelle stated: "'Here is whats gonna happen, [Coticchio] is gonna get the $50,000.'"  (*Id.*).  Minuto responded "No, he's not."  (*Id.*).  When Minuto continued to refuse to pay Coticchio $50,000 of Minuto's compensation, Fixelle told Minuto: "'Well then get out, you're not getting your money, you're fired.'"  (*Id.*).

As Minuto gathered his belongings, Fixelle allegedly shouted profanities and told Minuto that he would never see any of his money and the money he was already paid would be spent on attorney's fees.  (*Id.* ¶ 38).  Subsequent to the firing, Fixelle allegedly contacted most if not all of Minuto's brokers "and falsely denigrated Minuto to them."  (*Id.* ¶ 55).

### III.    Legal Standards

### A.  Rule 12(b)(6)

On a motion to dismiss pursuant to Rule 12(b)(6), "courts are required to accept all well pleaded allegations in the complaint as true and draw all reasonable inferences in favor of the non-moving party." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008); *Burrell v. DFS Servs., LLC*, 753 F. Supp. 2d 438, 440 n.1 (D.N.J. 2010) (holding that contradictory factual assertions on the part of defendants must be ignored).  Courts must "determine whether, under any reasonable reading of the complaint, the Plaintiff may be entitled to relief." *Pinker v. Roche Holding Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002).  But, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Determining whether the allegations in a complaint are "plausible" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009). "Courts are not required to credit bald assertions or legal conclusions draped in the guise of factual allegations." *McCargo v. Hall*, No. 11-553, 2011 WL 6725613, *1 (D.N.J. 2011) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 (3d Cir. 1997)).  A pleading that offers "labels and conclusions" or a "formulaic recitation of the elements of a cause of action will not do." *Iqbal*, 129 S. Ct. at 1949 (citations omitted).  Additionally, in evaluating a plaintiff's claims, generally "a court looks only to the facts alleged in the complaint and its attachments without reference to other parts of the record." *Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).

"As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.  However, an exception to the general rule is that a

document *integral to or explicitly relied* upon in the complaint may be considered without converting the motion [to dismiss] into one for summary judgment." *DiFronzo v. Chiovero*, 406 F. App'x 605, 607 (3d Cir. 2011) (citing *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d at 1426 (alteration and emphasis in original)).   Any further expansion beyond the pleading, however, may require conversion of the motion into one for summary judgment.

In *Twombly*, the Supreme Court set forth the "plausibility" standard for overcoming a motion to dismiss.   It refined this approach in *Iqbal*.   A complaint satisfies the plausibility standard when the factual pleadings "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).   This standard requires showing "more than a sheer possibility that a defendant has acted unlawfully."   *Id.*   A complaint that pleads facts "'merely consistent with a defendant's liability, stops short of the line between possibility and plausibility of entitlement of relief.'"   *Id.* (quoting *Twombly*, 550 U.S. at 557).

With this standard in mind, the Court analyzes the parties' arguments on dismissal.

## IV.   Analysis

Defendants move to dismiss the following claims: Count One (alleging common law fraud); Count Two (alleging breach of contract); Count Three (alleging breach of the implied covenant of good faith and fair dealing); Count Four (alleging intentional interference with prospective economic advantage); Count Five (alleging defamation); and Count Six (alleging unjust enrichment).   The Court will now address each claim in turn.

### 1.   Count One: Fraud

Even accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has failed to sufficiently allege a plausible claim for fraud.   The five elements of common law fraud

are: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages."  *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997).

Defendants argue that Minuto has failed to sufficiently allege facts to support the existence of a material misrepresentation, fraudulent intent, reliance, and damages.  (Moving Br. at 6-10).  Plaintiff responds that he has sufficiently alleged a plausible claim for common law fraud and points to several specific allegations in the Complaint for support.  (Pl. Opp. Br. at 2-4).

Here, Minuto offers allegations from the Complaint that satisfy every element of the claim except the second element—"knowledge or belief by the defendant of its falsity."  For the first element, he alleges the misrepresentation ("he would be paid forty percent of his P&L"), who made it (Fixelle) and when it happened (at the time he was hired).  (*See* Compl . ¶¶ 10, 40).  He also provides sufficient facts to support the third element—"an intention that the other person rely on it"—because it is reasonable to infer that Fixelle would intend for Minuto to rely on the promise of the terms of employment when considering and ultimately accepting the offer of employment.  Indeed, this inference is supported by Minuto's allegation that he was hired partly because of his extensive personal contacts.  (*Id.* ¶ 9).  As to the fourth element, Minuto clearly relied on the statement because he became an employee of Genesis and traded IPO shares on its behalf.  Finally, the alleged damages include, at the very least, his remaining compensation.  (*Id.* ¶ 44).  However, Minuto has failed to demonstrate that Fixelle had knowledge of the statement's falsity.  *See Gennari*, 691 A.2d at 367 (the second element of common law fraud requires the speaker's knowledge of the statement's falsity).  There are no clear allegations that Fixelle knew

that he would not pay Minuto forty percent of his P&L. Moreover, the Complaint does not include allegations from which the Court could plausibly infer that the practice at Genesis is to promise a particular compensation package and then not perform on that promise.  Indeed, even if such an inference could be made, it would conflict with Minuto's allegation that he is unaware of anyone else at the office who had been asked to "give back" to Genesis or share with coworkers.  (*Id.* ¶ 21, 28).  In other words, as currently plead, the Complaint suggests that it is not Genesis's common practice to promise a particular compensation structure and then not perform on that promise.  Therefore, as the currently drafted, the Complaint fails to allege that Fixelle or Genesis had knowledge or belief of the falsity of Minuto's compensation package.

Based on the foregoing analysis, Count One for common law fraud is dismissed without prejudice.  Plaintiff is granted leave to file an amended complaint within thirty days to cure the deficiencies identified above or by motion to amend the complaint if discovery reveals facts relevant to the deficiencies identified above.[1]

### 2. Count Two: Breach of Contract

Accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has sufficiently alleged a plausible claim for breach of contract.  To state a claim for breach of contract, a plaintiff must allege sufficient facts to demonstrate that (1) the parties entered into a valid contract; (2) defendant failed to perform his obligations under the contract; and (3) that plaintiff sustained damages as a result of the breach. *Murphy v. Implicito*, 920 A.2d 678, 689 (N.J. Super. Ct. App. Div. 2007) (citation omitted).

Defendants argue that Count Two should be dismissed because Plaintiff has failed to demonstrate that there was a valid and enforceable contract. (Moving Br., D.E. 4-1, at 10).

---

[1] Plaintiff should be cognizant of the fact that any future pleadings will be subjected to scrutiny under Federal Rule of Civil Procedure 9(b), which imposes a heightened pleading requirement concerning allegations of fraud over and above that required by Rule 8(a).

Specifically, Defendants contend that Plaintiffs do not allege the form of the contract (written or oral), the term of employment, Minuto's responsibilities, how or when Plaintiff would perform tasks, and how his work would be evaluated.  (*Id.* at 11).  Plaintiff argues that he does not have to provide such specificity at this stage of the litigation and, even so, an essential term—compensation—was present and clearly defined in the Complaint.  (Pl. Opp. Br., D.E. 5, at 5).

"Parties create an enforceable contract when they agree on essential terms and manifest an intent to be bound to those terms."  *Weichert Co. Realtors v. Ryan*, 608 A.2d 280, 284 (N.J. 1992) (internal quotes and cites omitted).  The Third Circuit has held that the form of a contract need not be pled in the Complaint to withstand 12(b)(6) scrutiny, even when a written contract is statutorily required, if subsequent actions indicate the existence of a contract.  *Jame Fine Chemicals Co., Inc. v. Hi-Tech Pharmacal Co., Inc.*, 44 F. App'x. 602 (3d Cir. 2002).

Here, Plaintiff alleges that "Genesis contracted with Minuto and agreed to pay him forty percent of his monthly P&L."  (Compl. ¶ 46).  As to his responsibilities, he clearly states that he was hired by Genesis "to start and manage a hedge fund with the assets of Genesis."  He was "to establish a limited liability company (LLC) in which he was the sole, managing member."  Through the LLC, he "was to acquire broker relationships at large bracket banks on Wall Street . . . [through which he] was to exclusively trade shares of [IPOs]."  (*Id.* ¶ 6).

Throughout the Complaint, Minuto describes in detail his work as an employee of Genesis.  And, tellingly, Defendants do not deny that such employment existed.  Therefore, his subsequent work for and interactions with Genesis and Fixelle sufficiently indicate the existence of an agreement.  Finally, as to the term of employment, Minuto alleges that Fixelle estimated that, depending on Minuto's progress, it would take Minuto between three and six months before

- 12 -

Minuto would earn money "equal to or in excess of the draw." (*Id.* ¶ 10). At the very least, this indicates that Fixelle envisioned that Minuto would remain with Genesis for at least six months.

Defendants' reliance on *Baer v. Chase*, 392 F.3d 609 (3d Cir. 2004) and *Leibholz v. Hariri*, No. 05-5148, 2011 WL 1466139 (D.N.J. Apr. 15, 2011) to support their contention that Minuto must plead with significantly more specificity is unpersuasive because both of those cases dealt with summary judgment, which imposes a higher standard on proving factual allegations than Rule 12(b)(6).

For the foregoing reasons, the Court finds that Plaintiff has alleged sufficient facts to state a claim for breach of contract that is plausible on its face.

### 3. Count Three (Breach of the Implied Covenant of Good Faith and Fair Dealing)

Accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has sufficiently alleged a claim for breach of the implied covenant of good faith and fair dealing. Every contract entered into under the laws of New Jersey contains an implied covenant of good faith and fair dealing. *Kalogeras v. 239 Broad Ave., L.L.C.*, 997 A.2d 943, 953 (N.J. 2010). "Good faith entails adherence to community standards of decency, fairness or reasonableness, and requires a party to refrain from destroying or injuring the right of the other party to receive its contractual benefits." *Iliadis v. Wal–Mart Stores, Inc.*, 922 A.2d 710, 722 (N.J. 2007) (internal citations and quotations omitted). "The party claiming a breach of the covenant of good faith and fair dealing 'must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties.'" *Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Ctr. Assocs.*, 864 A.2d 387, 396 (N.J. 2005) (citation and internal quotations omitted). "A plaintiff may be entitled to relief in an action under the covenant if the defendant acts with ill

motives and without any legitimate purpose to destroy the plaintiff's reasonable expectations." *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001). However, "bad motive or intention is essential," and "an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive." *Id.*

Defendants argue that Plaintiff has failed to allege sufficient facts to indicate the existence of a contract and therefore Minuto's argument about the implied covenant is moot. (Moving Br. at 12). Alternatively, even assuming the existence of a contract, Defendants argue that Plaintiff has failed to sufficiently allege that Defendants had "bad motive or intention." Plaintiff argues that he has sufficiently alleged "bad motive or intention" and points to several specific allegations in the Complaint for support. (Pl. Opp. Br. at 5-6).

The Court has already determined that Plaintiff sufficiently pled facts to support the plausible existence of a contract. Therefore, the Court need only address whether Plaintiff has sufficiently alleged Defendants' bad motive or intention. Minuto states that the essential term of the agreement was that, once he reached the $7,000 threshold, he was to be paid the higher of the draw ($7,000) or forty percent of his net P&L. (Compl. ¶ 10). Thus, he had a reasonable expectation that he would receive one of the two amounts on a monthly basis. Defendants' ill motives and purpose to destroy Minuto's reasonable expectations are demonstrated by Plaintiff's allegations that Fixelle (1) told Minuto he would have to give some of his money back to the company if he wanted to remain at Genesis, (*id.* ¶¶ 21, 25); (2) attempted to force Minuto into paying $75,000 to the Wolfson Family, (*id.* ¶ 25); (3) attempted to force Minuto into paying a part of his compensation to Coticchio, (*id.* ¶ 36); (4) attempted to take 100,000 shares of the HCA IPO from Minuto, (*id.* ¶ 20); (5) paid Minuto less than his expected P&L, (*id.* ¶¶ 33-34); and (6) "doctor[ed]" Minuto's P&L so as to reduce the true compensation to which he was

entitled, (*id.* ¶ 32).  Further, as Minuto explains, the improper requests for shares or money were not common to the office culture.  (*Id.* ¶¶ 21, 28).  Each of the foregoing allegations is sufficient to demonstrate Defendant's ill motive or intent to destroy Minuto's expectations as to his income, *i.e.*, forty percent of his net P&L.

Based on the foregoing, the Court finds that Plaintiff has sufficiently pled Count Three of the Complaint.

### 4.  Count Four (Intentional Interference with Prospective Economic Advantage)

Accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has sufficiently alleged a claim for intentional interference with prospective economic advantage. The elements of an intentional interference claim are: "(1) a plaintiff's reasonable expectation of economic benefit or advantage, (2) the defendant's knowledge of that expectancy, (3) the defendant's wrongful, intentional interference with that expectancy, (4) in the absence of interference, the reasonable probability that the plaintiff would have received the anticipated economic benefit, and (5) damages resulting from the defendant's interference."  *Printing Mart–Morristown v. Sharp Elec. Corp.*, 563 A.2d 31, 36-37 (N.J. 1989); *Central Lewmar, L.P. v. Gentilin*, No. 03-4671, 2005 WL 1308235, *4 (D.N.J. June 1, 2005) (citation omitted).

In support of Count Four, Plaintiff alleges that "subsequent to Fixelle firing Minuto, Fixelle contacted most if not all of [the] brokers and falsely denigrated Minuto to them." (Compl. ¶ 55).  "In contacting the brokers and falsely denigrating Minuto to them, Fixelle intended to destroy Minuto's relationships with these brokers in an effort to commandeer them for his benefit and that of Genesis."  (*Id.* ¶ 56).  As a result, Minuto has been damaged "in that Minuto no longer is able to do business with these brokers. He has lost all future business that he would otherwise have been able to generate with them."  (*Id.* ¶ 57).

- 15 -

Defendants argue that Plaintiff has failed to sufficiently allege the following three elements of intentional interference with prospective economic advantage: (1) a reasonable expectation of economic benefit or advantage; (2) the defendant's wrongful, intentional interference with that expectancy; and (3) damages resulting from the defendant's interference. (Moving Br. at 15).  Specifically, Defendants argue that Plaintiff's allegation of a reasonable expectation of economic benefit or advantage is at most speculative because Plaintiff does not name the specific brokers with whom he expected to have relationships in the future, the nature of those relationships and to what extent he could be certain of the expected economic benefit. (*Id.* at 15-16).  Further, Defendants contend that Plaintiff cannot prove that Fixelle's conduct was wrongful because Minuto does not provide specificity as to what Fixelle said to denigrate Plaintiff's reputation.  (*Id.* at 16-17).  Finally, Defendants argue that Minuto does not sufficiently allege damages.  Plaintiff replies that he has sufficiently pled these elements and points to specific allegations in the Complaint for support.  (Pl. Opp. Br. at 7-8).

Taking all of the allegations in the Complaint as true, the Court finds that Plaintiff has sufficiently alleged "a reasonable expectation of economic benefit or advantage."  Plaintiff alleges that he "established broker coverage at Goldman Sachs, JP Morgan, Deutsche Bank, Credit Suisse and Bank of America Merrill Lynch."  (Compl. ¶ 9).  He was able to open broker accounts at these banks because of his "significant personal contacts within the banks."  (*Id.*). These personal contacts "were one of the principal reasons he was hired by Genesis."  (*Id.*). Thus, he identifies the specific banks with which he had relationships and which relationships Genesis recognized.  In addition, he identifies a specific person at Goldman, Sara Naison-Russell, with whom he set up a $250,000 account and who "told Minuto that she would love to do more business with him."  (*Id.* ¶ 30).  That allegation alone indicates a prospective economic

relationship with at least one bank and broker.  *Solutions Partners, Inc. v. Thomas*, No. 09-4778, 2010 WL 2036139, at *3 (D.N.J. 2010) ("In this case, although Thomas does not allege explicitly that he has a contractual relationship with South Jersey Healthcare, he does allege that he has a working relationship with it, sufficient for him to reasonably expect economic advantages.").   The cases on which Defendants rely are inapposite.   *See, e.g., Novartis Pharmaceuticals Corp. v. Bausch & Lomb, Inc.*, No. 07-5945, 2008 WL 4911868, at *7 (D.N.J. November 13, 2008) (dismissing claim where plaintiff failed to "identify one physician, company, or other entity, with whom it currently does business, or has the reasonable expectation of doing business in the future"); *Valentine v. Bank of America*, No. 09-262, 2010 WL 421087, at *3-4 (D.N.J. Feb. 1, 2010) (dismissing bank tellers claims as "speculative" where plaintiff could not point to specific relationships or contracts).

As to whether Minuto has pled "wrongful, intentional interference," the Court is unaware of any case in the Third Circuit or District of New Jersey that requires the actual content of the statements to be pled at this stage in the litigation.  The Third Circuit case on which Defendants rely does not appear to stand for that proposition.  *See, e.g., American Millennium Ins. Co. v. First Keystone Risk Retention Group, Inc.*, 332 Fed.Appx. 787, 790-791 (3d Cir. 2009) ("AMI makes only a bald assertion that the RRG's conduct was intentional, and does not allege facts that could substantiate the necessary existence of malice.").  Indeed, this particular element only requires some allegation that Defendant's conduct was wrongful and intentional.  *Id.*  Here, Plaintiff alleges that "Fixelle contacted most if not all of [the] brokers and falsely denigrated Minuto to them," (Compl. ¶ 55), because "Fixelle intended to destroy Minuto's relationships with these brokers in an effort to commandeer them for his benefit and that of Genesis," (*id.* ¶ 56).  These allegations are sufficient because they allege wrongful and intentional conduct (*i.e.*

- 17 -

lying in order to usurp a broker relationship).  The Court notes that the case on which Plaintiff relies—*In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. 584 (D.N.J. 1996)—dealt with fraud and is therefore inapplicable here.  (Pl. Opp. Br. at 8).

Finally, Defendants' argument that Minuto must allege damage with specificity is incorrect.  The cases on which Defendants rely are inapposite.  In *Solutions Partners*, the plaintiff did not identify what past or future opportunities had been impaired.  *See Solutions Partners,* 2010 WL 2036139, at *3 ("In other words, Thomas is responsible to plead what, if any, opportunities have already been impaired or what future assignments he may lose on account of SPI's interference.").  In *Koger*, the plaintiff failed to identify specific business relationships and defendant's specific alleged conduct.  *Koger, Inc. v. Klco*, No. 08-4175, 2009 WL 905061, at *5 (D.N.J. Mar. 9, 2009) ("Count I makes no factual allegations identifying what business relationships were interfered with nor specifying the conduct of Defendants that has injured Plaintiff.").  Here, as discussed earlier, Plaintiff has identified several banks and at least one person with whom he had a prospective business relationship.

Accordingly, the Court finds that Plaintiff has pled sufficient facts to state a plausible claim for intentional interference with prospective economic advantage under Count 4.

### 5.  Count 5 (Defamation)

Even accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has failed to sufficiently allege a plausible claim for defamation.  The elements of defamation are: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher[;]" and (4) damages.  *DeAngelis v. Hill*, 847 A.2d 1261, 1267-68 (N.J. 2004).  A plaintiff must plead special damages, which are defined as "harm of a material or pecuniary

nature." *Ward v. Zelikovsky*, 643 A.2d 972, 984 (N.J. 1994).  The Court may not infer damages. *Id.* at 984.

Defendant argues that Plaintiff has failed to sufficiently allege (a) a false and defamatory act and (b) damages.  (Moving Br. at 18-20).  Plaintiff argues that he has plead the existence of a false and defamatory statement, and that details such as what specifically was said and where it was said will be revealed through discovery and need not be pled here.  (Pl. Opp. Br. at 8-9).

Plaintiff alleges the following as to defamation:

> In an effort to commandeer Minuto's business relationships with Goldman Sachs and other brokers, Fixelle defamed Minuto by uttering false statements about him to brokers. Minuto has been damaged as a result of this defamation, in that Minuto no longer is able to do business with these brokers. He has lost all future business that he would otherwise have been able to generate with them.

(Compl. ¶¶ 58-60).

The Court finds that Plaintiff has failed to allege a false and defamatory act.  While a Plaintiff "is not required to plead every element of a prima facie case," he "must plead facts sufficient to identify the defamatory words, their utterer and the fact of their publication." *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 63 (N.J. Super. Ct. App. Div. 1986).  In other words, he must identify the "when, where, by which defendants and by what words ... [he] was defamed." *Id.* at 62.  Here, Defendant has pled when he was defamed—in the time after he was fired.  He has also pleads who defamed him—Fixelle.  Finally, he pleads where the defamatory statements were made—at the specific banks.  He does not, however, plead what specific statements were made.  For that reason, Plaintiff's defamation claim is dismissed without prejudice.  *Foy v. Wakefern Food Corp.*, No. 09-1683, 2010 WL 147925, at *6 (D.N.J. Jan. 7, 2010) (dismissing claim where plaintiff alleged only the following: "[Defendant] did and continues to make defamatory statements about [Plaintiff] that are false, i.e. [Plaintiff] was a

criminal that stole goods. Those false statements and documents are published to third parties, and [Plaintiff] continues to be harmed by such defamatory statements."); *Zoneraich v. Overlook Hosp.*, 514 A.2d 53, 62 (N.J. Super. Ct. App. Div. 1986) (dismissing claim where plaintiff alleged: "The defendants have tortiously interfered with plaintiff in the exercise of her profession and they have slandered and defamed her and willfully, unlawfully and maliciously exposed her to public ridicule."). Plaintiff's reliance on *In re Prudential Ins. Co. of Am. Sales Practices Litig.* for the proposition that Plaintiff need not plead the contents of the statements here because that content is within the knowledge and control of Defendants, is inapposite. The court in *Prudential* was discussing the heightened pleading standard governing fraud and the need to plead every element with particularity in the Complaint. *In re Prudential Ins. Co. of Am. Sales Practices Litig.*, 975 F. Supp. at 584 (citation omitted).

Based on the foregoing analysis, Count 5 for defamation is dismissed without prejudice. Plaintiff is granted leave to file an amended complaint within thirty days to cure the deficiencies identified above or by motion to amend the complaint if discovery reveals facts relevant to the deficiencies identified above.

### 6. Count 6 (Unjust Enrichment)

Accepting the facts of Plaintiff's Complaint as true, the Court finds that Plaintiff has sufficiently alleged a plausible claim for unjust enrichment. In New Jersey, a plaintiff claiming unjust enrichment must show that (1) that the defendant received a benefit from the plaintiff; and (2) the defendant's retention of that benefit without payment would be unjust. *Cameco, Inc. v. Gedicke*, 690 A.2d 1051, 1059 (N.J. Super. Ct. App. Div. 1997) (citation omitted). "The unjust enrichment doctrine requires that the plaintiff show that [he] expected remuneration from the defendant at the time [Plaintiff] performed or conferred a benefit on [the] defendant and that the failure of remuneration enriched [the] defendant beyond its contractual rights." *Id.*

- 20 -

Defendants argue that Plaintiff must do more than merely allege that Defendants were "unjustly enriched." According to Defendants, Minuto must provide substantive allegations demonstrating why the enrichment was "unjust" and "beyond Defendant's contractual rights." (Moving Br. at 22) (citations omitted). Defendants argue that Plaintiff has failed to sufficiently plead "enrichment" or that it would be "unjust" to allow them to retain that benefit. Specifically, Defendants contend that Plaintiff claims that the HCA trade resulted in $1,120,000, but does not take into consideration the commissions, transaction costs, or the cost of the capital required to complete the transactions. Nor does Plaintiff address whether the gross profit was fair compensation for the risk Defendants took in purchasing one million shares. (Moving Br. at 22). Plaintiff argues that he has sufficiently pled the elements of unjust enrichment and points to allegations in the Complaint for support. (Pl. Opp. Br. at 9-10).

The Court finds that Plaintiff has sufficiently pled unjust enrichment. The Court has already determined that Plaintiff has sufficiently pled facts that suggest the the existence of a valid and enforceable contract. An essential term of that contract was that once "Minuto reached the $7,000 threshold, he was [to] be paid, monthly, the higher of the [$7,000] draw or . . . forty percent of the net P&L regarding his transactions." During and in the scope of his employment, Minuto claims to have brokered a deal involving one million HCA shares which produced a gross profit of $1,120,000 on the IPO offering. This was in addition to the profit on other trades he executed during March 2011. (Compl. ¶ 22). Further, he claims that the paycheck he received on April 5, 2011 indicated less than he believed he was entitled to under the terms of his agreement and in light of the HCA trade. (*Id.* ¶ 27). A revised paycheck given to him on April 15, 2011 indicated an even smaller amount. (*Id.* ¶ 32). He alleges that he was not paid the full amount of what he is entitled to under his agreement with Genesis. (*Id.* ¶¶ 34, 38). Indeed,

Plaintiff alleges that Fixelle told him "you're not getting your money" and that Fixelle would make sure that Minuto would never see any of his money." (*Id.* ¶¶ 37, 38).  The preceding allegations plausibly suggest that Minuto conferred a benefit on Genesis—high profits from the HCA trade—through his own work, and that Genesis and Fixelle were unjustly enriched in that they kept a portion of the forty percent of P&L from that trade that Minuto was entitled to under the terms of his employment agreement with Genesis.  Therefore, the Court finds that Plaintiff has sufficiently pled unjust enrichment.  Defendants' argument that Plaintiff does not take into account the costs and risks that went into his executing the HCA does nothing to diminish the allegation that he conferred a benefit on Defendants.

Accordingly, the Court finds that Plaintiff has sufficiently pled Count 6 of the Complaint.

**V.      Conclusion**

Based on the foregoing, Defendants' motion to dismiss (D.E. 4) is GRANTED in part and DENIED in part.  An appropriate Order shall follow.


*s/Esther Salas*
**Esther Salas, U.S.D.J.**